IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL T. WOHLEBER, | ) | CASE NO. 1:15CV2294 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Michael Wohleber ("Wohleber") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 13.

As set forth more fully below, the Administrative Law Judge ("ALJ") failed to adequately explain why he did not give controlling weight to an opinion the ALJ concluded was the opinion of Dr. Berenger, a treating source.  As a result, the undersigned cannot conduct a meaningful review of the Commissioner's decision and is unable to conclude that the Commissioner's decision is supported by substantial evidence.  Accordingly, the Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

**I. Procedural History**

On April 16, 2012, Wohleber protectively filed application for DIB and SSI, alleging a disability onset date of January 15, 2010.  Tr. 19, 215.  He alleged disability based on the

following: degenerative disc disease in his back and depression.  Tr. 218.  After denials by the

state agency initially (Tr. 83, 95) and on reconsideration (Tr. 109, 123), Wohleber requested an

administrative hearing.  Tr. 152-153.  A hearing was held before Administrative Law Judge

("ALJ") Peter Beekman on February 27, 2014 (Tr. 38-71).  In his March 24, 2014, decision (Tr.

19-32), the ALJ determined that Wohleber could perform jobs that exist in significant numbers in

the national economy, i.e., he was not disabled.  Tr. 31.  Wohleber requested review of the ALJ's

decision by the Appeals Council (Tr. 7) and, on September 8, 2015, the Appeals Council denied

review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Wohleber was born in 1977 and was 35 years old on the date his application was filed.

Tr. 214.  He has an associate's degree.  Tr. 41.  He previously worked as a crew member and

general manager at a fast food restaurant, a teacher at a daycare center, and a clerk at a grocery

store.  Tr. 41-42.  He last worked in June 2013.  Tr. 42.

### B.  Relevant Medical Evidence

Wohleber had lumbar spine surgery in 2006 for right L4 to L5 disc extrusion.  Tr. 435.

He reported that the surgery gave him pain relief for one year.  Tr. 435.

On February 3, 2009, Wohleber saw Margaret Tsai, M.D., complaining of back pain.  Tr.

397.  He stated that he had also experienced increased weakness and discomfort in his left lower

extremity as a result of his lower back pain radiating downward, similar to the symptoms he

experienced prior to his 2006 surgery.  Tr. 397.  Upon exam, Wohleber ambulated well without

assistance.  Tr. 398.  He had no tenderness to palpation in his knees, fair range of motion with

pain in his knees, and slight tenderness to palpation in his back.  Tr. 398.  He had 5/5 strength

and normal muscle tone.  Tr. 398.   Dr. Tsai diagnosed him with lumbago, general osteoarthrosis, and sciatica.  Tr. 398.  She recommended medication and physical therapy.  Tr. 398.

On March 12, 2009, Wohleber had an MRI of his lumbar spine.  Tr. 382.  He had moderate disk height loss at L4 to L5; mild and moderate narrowing at L4 to L5; mild disk height loss at L3 to L4 and L1 to L2; mild narrowing at L3 to L4; and a small amount of postoperative granulated tissue at the L5 nerve root and the thecal sac at L4 to L5 but no evidence of recurrent disc protrusion or extrusion.  Tr. 382.

On April 6, 2009, Wohleber reported to Dr. Tsai at a follow-up visit that he had not yet started physical therapy due to a heavy school schedule, work and family responsibilities.  Tr. 404.  On June 6, 2009, Wohleber stated that his "medro pak really helped" but that he had been too busy to start physical therapy.  Tr. 411.  He was feeling "much better."  Tr. 411.

On September 1, 2009, Wohleber complained to Dr. Tsai that his back pain had worsened and he had numbness and tingling in his lower extremity.  Tr. 417.  Upon exam, his gait was slow and it was hard for him to stand from a sitting position.  Tr. 418.  Dr. Tsai recommended he consult pain management. Tr. 419.  On December 9, 2009, Wohleber reported pain and numbness in his right lower leg.  Tr. 425.  He stated that he was stressed because he was studying for finals and had stayed up all night for Thanksgiving preparations.  Tr. 425.

On January 28, 2010, Wohleber visited pain management.  Tr. 432.  He saw Philippe Berenger, M.D., and Certified Nurse Practitioner Lynn Gaddis.  Wohleber reported low back pain radiating into his right thigh.  Tr. 432.  His pain was worse with sitting and sustained standing but not with walking.  Tr. 435.  Upon exam, Wohleber's gait was normal and he had a normal range of motion in his lumbar spine.  Tr. 433.  He had full strength and negative straight leg raise testing.  Tr. 434.  He had a normal range of motion in his hips and no pain with flexion,

extension or internal rotation but a positive Fabere sign.[1]  Tr. 434.  His reflexes were normal and symmetrical and his sensation grossly intact.  Tr. 434.  Dr. Berenger diagnosed him with postlaminectomy syndrome in his lumbar region, lumbosacral radiculitis, and facet arthropathy of his spine.  Tr. 435.  He recommended a medial branch nerve block of his lumbar spine.  Tr. 436.  An x-ray of his lumbar spine documented degenerative changes, including mild s-shaped scoliosis with disc space narrowing at L1-2, L3-4, and L4-5.  Tr. 385.

On February 3, 2010, Wohleber received a lumbar injection.  Tr. 599.

On May 5, 2010, Wohleber saw Dr. Tsai.  Tr. 345.  He reported that his back pain was greatly improved with exercise (his weight was down 20 pounds, to 263) and diet and he was no longer taking his muscle relaxant.  Tr. 345.  He reported that his lumbar injection did not help. Tr. 345, 354.  Upon examination, Wohler ambulated slowly due to pain and had difficulty standing from a seated position. Tr. 347.

On December 19, 2011, Wohleber saw Dr. Tsai complaining of a recurrence of his low back pain with radiation to his right lower extremity that began the last few weeks.  Tr. 354.  His weight was up to 322 pounds.  Tr. 354.  He reported pain that was 5/10. Tr. 354.  Upon examination, Wohleber ambulated slowly due to pain and had difficulty standing from a seated position.  Tr. 355.  He had a positive straight leg raise test. Tr. 355.  An EMG study of his right lower leg was performed on January 4, 2012, and the findings were normal.  Tr. 361. The notes stated that the study was slightly hampered by Wohleber's reduced pain tolerance to the study. Tr. 361.

On April 2, 2012, Wohleber reported to Dr. Tsai that his back pain was intense and he was only able to sleep one hour at a time due to pain and that no position was comfortable.  Tr.

---

[1]  A Fabere sign, also called a Patrick test, indicates arthritis of the hip.  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1711, 1896.

372.  He reported that he could not tolerate the physical therapy he had started since his last visit.
Tr. 372.  Dr. Tsai noted that he looked tired, uncomfortable and favored his right side. Tr. 373.
An x-ray taken on April 26, 2012, showed that the multilevel degenerative changes in his lumbar
spine had progressed.  Tr. 449.

On May 21, 2012, Wohleber returned to pain management and saw Nurse Gaddis.  Tr.
599.  He reported that his low back pain had flared up a few months earlier and he was having
burning and numbness to his right leg, especially when driving. Tr. 599.  He stated that his
medications had helped a little but not the Neurontin or Percocet.  Tr. 599-600.  Upon exam,
Wohleber's reflexes were symmetrical and he had 5/5 muscle strength.  Tr. 600.  He showed
some dorsiflexion weakness, was able to heel and toe walk, had low back pain into his thigh with
lumbar flexion and extension, and a positive straight leg raise on his right leg.  Tr. 599-600.
Gaddis remarked that, although Wohleber stated that his prior back injections did not provide
relief, his pain had dropped to 1/10 from 5/10 after his injection.  Tr. 600.  She recommended he
continue his medications and have a transforaminal lumbar epidural steroid injection at L4 to L5.
Tr. 600.

On June 29, 2012, Dr. Berenger performed an epidural steroid injection.  Tr. 483-484.

On October 16, 2012, Wohleber told Dr. Tsai that he had good results from the back
injections but that it caused weight gain.  Tr. 591.  He complained of right lower extremity
burning pain and cramping in the bottom of his right foot.  Tr. 591.  He had a positive straight
leg raise test. Tr. 593. Dr. Tsai added fibromyalgia to his diagnoses.  Tr. 593.

On November 8, 2012, Wohleber saw Nurse Gaddis and Dr. Berenger.  Tr. 588-589.  He
reported that he had more pain after the recent injection and that his pain had shifted to the left
side.  Tr. 588.  He also stated that he had improved 40% with the epidural injection and that his

pain relief had lasted four weeks.  Tr. 589.  He did not return for a second injection because he had upper back spasms and was afraid to return.  Tr. 589.  After discussion about back spasms, Wohleber agreed to a second injection and increased his Neurontin intake.  Tr. 589.

On May 20, 2013, Wohleber told Dr. Berenger that his back and leg pain were slightly worse and that his right leg felt numb.  Tr. 572.  His low back pain was worse with sitting and walking and was best with lying down.  Tr. 572.  He reported that his medications had helped a little but that physical therapy was not beneficial. Tr. 572-573.  Upon examination, Wohleber had a positive straight leg raise on his right and pain with lumbar flexion. Tr. 573.  He had 5/5 strength and motor findings.  Tr. 572-573.  Dr. Berenger commented, "He really has chronic pain—appears angry."  Tr. 573.   He diagnosed postlaminectomy syndrome in his lumbar region and lumbosacral radiculitis and fibromyalgia.  Tr. 572-573.  He ordered x-rays and an MRI of Wohleber's lumbar spine.  Tr. 573.  The lumbar MRI was done on May 28, 2013, and was compared to the MRI from March 2009.  Tr. 575.  The May 2013 MRI showed new broad-based disc extrusion at L2 to L3 causing moderate narrowing of the spinal canal; an increase from mild to moderate narrowing of the spinal canal caused by disc osteophyte complex at L3 to L4; and a new small central protrusion at L5 to S1 causing mild narrowing of the spinal canal.  Tr. 575-576.

On July 15, 2013, Dr. Berenger performed a right-sided transforaminal lumbar epidural steroid injection at L3 to L4.  Tr. 623-625.  On August 21, 2013, and October 19, 2013, Dr. Berenger performed a second and third right-sided transforaminal lumbar epidural steroid injection at L3 to L4.  Tr. 615-617, 619-621.  Wohleber reported no further lower extremity pain since his first injection in July 2013, though he still complained of back pain.  Tr. 615, 619.

On November 5, 2013, Wohleber saw orthopedic surgeon and spine specialist R. Douglas Orr, M.D.  Tr. 610.  Wohleber reported back pain radiating down into his right calf, with numbness in his right foot off and on.  Tr. 610.  His pain was made worse with activity, made somewhat worse with prolonged standing or walking, and made better by sitting upright in a hardback chair.  Tr. 610.  He reported that three epidural injections had provided some relief temporarily and that he was still experiencing some relief since his last one.  Tr. 610.  Upon examination, Physician Assistant David Harrison noted a normal gait, full muscle strength, no paraspinal pain, and mild tenderness to palpation in his lumbar area.  Tr. 611.  Dr. Orr reviewed Wohleber's imaging results and opined that there may not be a surgical option; instead, he recommended smoking cessation, weight loss, and a right-sided L4 to L5 transforaminal epidural injection.  Tr. 610.

On November 11, 2013, Dr. Berenger performed the epidural injection at L4 to L5 at Dr. Orr's recommendation.  Tr. 606.  Wohleber reported that the three injections at L3 to L4 had improved his right leg symptoms by 75% but had not improved his low back pain.  Tr. 606.

**C. Medical Opinion Evidence**

**1. Treating Source Opinion**

On June 24, 2013, Nurse Gaddis filled out a prescription form stating, "please excuse [Wohleber] from repetitive lifting activities; do not lift above 25 pounds.  Avoidance of overhead lifting and bending activities for 2 months."  Tr. 546.

On July 15, 2013, Gaddis completed a medical source statement that was signed by Dr. Berenger.  Tr. 553.  Gaddis did not offer an opinion regarding Wohleber's ability to sit, stand and walk.  Tr. 553.  She reported that, due to lumbar pain, Wohleber could not lift or carry more than five pounds on a regular and continuing basis during an eight-hour workday.  Tr. 553.  He

could occasionally stoop and reach above shoulder level and never balance.  Tr. 553.  His pain

was moderate and he would need a job that permitted him to shift positions at will and stand, sit

and walk as needed.  Tr. 553.  The number of absences he would have would be unpredictable.

Tr. 553.

### 2.  State Agency Reviewers

On June 11, 2012, state agency physician William Bolz, M.D., reviewed Wohleber's

record.  Tr. 78-79.  Regarding Wohleber's residual functional capacity ("RFC"), Dr. Bolz opined

that Wohleber could lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk and

sit about six hours in an eight-hour workday, could never climb ladders, ropes or scaffolds but

could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl.  Tr. 78-79.

On September 19, 2012, state agency physician Elaine Lewis, M.D., reviewed

Wohleber's record and agreed with Dr. Bolz's findings, but further limited him to avoiding all

exposure to hazardous machinery and doing no commercial driving. Tr. 103-105.

### D.  Testimonial Evidence

### 1.  Wohleber's Testimony

Wohleber was represented by counsel and testified at the administrative hearing.  Tr. 40-

58.  He lives with his two children, ages 11 and 13.  Tr. 43.  Three days a week he attends classes

for a few hours; two days he goes for three hours and one day for 50 minutes.  Tr. 43.  He also

studies at home to prepare when he is not in class, which he does for about three to four hours a

day.  Tr. 44.  He uses a computer to take tests, which last about an hour.  Tr. 44.  It takes him

awhile to do his homework and he usually does it in sessions, moving around.  Tr. 44.  Last

semester he performed "terrible" in school and he is repeating the same classes.  Tr. 48.  He

stated that he did so poorly in school because he was getting injections every two to three weeks

and missed a lot of class.  Tr. 48.  He could not focus or comprehend anything because of pain.

Tr. 48.  He is still failing his classes because he cannot sit in a lecture for an hour and 50 minutes

and has to get up and walk around and he misses out on a lot.  Tr. 49.  He has already missed five

days this semester and cannot miss any more.  Tr. 50.  He has an accommodation at school that

permits him extra time to take tests and audio books that he can listen to.  Tr. 49-50.

He drives to school, which is 15 miles away.  Tr. 43.  He missed two days of school this

semester because he was in the hospital and the other days he missed because he could not drive

due to pain.  Tr. 50.  He gets "bad shooting pains constantly down my right leg" and has to pull

over and wait until the pain leaves his leg.  Tr. 50.  This happens "just about" every day.  Tr. 51.

On days that he does not have class, Wohleber spends a lot of time sleeping, doing

homework, watching television, "or just lounging around."  Tr. 45.  He cooks and goes grocery

shopping with his children, who help by putting the groceries into the cart, loading them in the

car, and putting them away when they get home.  Tr. 45.  His daughter does the laundry.  Tr. 45.

At the hearing, his pain was 8/10.  Tr. 46.  He uses Flexeril to control his pain and

Tylenol in addition to cream his rheumatologist gave him.  Tr. 46.  He also takes medication for

his blood pressure and depression.  Tr. 46-48.  He previously had problems with his shoulder and

hand but he no longer has these problems.  Tr. 57.  He is six feet one inch tall and weighs 320

pounds; he has recently lost eight or nine pounds.  Tr. 46, 54.  He has been seeing a dietician and

is planning on having bariatric surgery to get his blood pressure down and to help with his sleep

apnea.  Tr. 54-55.

Wohleber stated that, previously when he worked 10-15 hours a week at a fast food

restaurant, he was accommodated because he had been working there a long time and was a good

worker.  Tr. 52.  His boss would let him go home if he was hurting and allowed him to take

breaks to rest as much as he wanted.  Tr. 52.  He took breaks more than half the time he was

there.  Tr. 52.  They would also try to find something for him to do that did not require working

with customers so breaking would not be a problem, such as sweeping and wiping tables.  Tr. 52.

He had to stop working because he was going to the doctor more and telling them he was hurting

more.  Tr. 52.  After he started getting his injections in his back he was getting worse and could

no longer work.  Tr. 52.  He tried not to take him medication when he was at work because it

made him "loopy" and not safe to be working.  Tr. 53.  He sees Dr. Berenger for pain

management and to get his back injections.  Tr. 53.

Wohleber testified that he has to get up "about every 15-20 minutes."  Tr. 55.  The only

thing that relieves his pain is sleeping, although he is up about every hour because of back and

leg pain.  Tr. 55-56.  Rain and snow make his pain worse, as well as lifting weight.  Tr. 57.  The

most he can lift without pain is a gallon of milk.  Tr. 57-58.

### 2. Vocational Expert's Testimony

 Vocational Expert ("VE") Kathleen Reis testified at the hearing.  Tr. 61-67.  The ALJ

discussed with the VE Wohleber's past relevant work.  Tr. 59.  The ALJ asked the VE to

determine whether a hypothetical individual of Wohleber's age, education and work experience

could perform the work he performed in the past or any other work if the individual had the

following characteristics: can lift/carry 20 pounds occasionally and 10 pounds frequently; can

stand, walk and sit for six out of eight hours but would need a sit-stand option with no loss of

productivity; can occasionally use a ramp or stairs but never a ladder, rope or scaffold; can

constantly balance, occasionally stoop and crouch, and never kneel or crawl; must avoid

exposure to high concentrations of cold; can do some complex tasks, up to SVP 4 and can do

simple, routine tasks, SVP 1 and 2, but cannot have high production quotas or piece-rate work.

Tr. 60.  The VE answered that such an individual could perform Wohleber's past work as a fast food worker as it is classified, and could also perform other, unskilled work such as merchandise marker (9,000 Ohio jobs; 250,000 national jobs), cashiering position (15,000 Ohio jobs; 800,000 national jobs), and housekeeping cleaner (4,000 Ohio jobs; 220,000 national jobs).  Tr. 61.

The ALJ asked the VE if jobs would be available for the hypothetical individual described if that individual was limited to lifting and carrying 10 pounds occasionally and 10 pounds frequently, and could stand and walk two hours and sit for six hours while maintaining the sit-stand option with no loss of productivity.  Tr. 62.  The VE answered that such an individual could not perform Wohleber's past work but could perform work as a food and beverage order clerk (900 Ohio jobs; 60,500 national jobs), document preparer (1,800 Ohio jobs; 70,000 national jobs), and ticket counter (1,300 Ohio jobs; 600,000 national jobs).  Tr. 62-63.

Next, Wohleber's attorney asked the VE whether a hypothetical individual could perform work if the individual was limited to lifting five pounds "occasionally and frequently," occasionally reaching and stooping and a sit-stand-walk option as needed.  Tr. 63.  The VE asked whether the sit-stand-walk option would include a loss of production and Wohleber's attorney answered that the individual could sit-stand-walk at will with no loss of production.  Tr. 63.  The VE answered that the limitations described a job at the less-than-sedentary level; that the DOT does not classify anything that is less than sedentary; and that, therefore, there would be no jobs the individual could perform.  Tr. 63.

Wohleber's attorney asked the VE whether the jobs she identified in answer to the VE's first hypothetical would permit an individual to sit down whenever he liked.  Tr. 64.  The VE replied, "let me change something in my answer.  And that would be to reduce the cashiering numbers by half, to 400,000 and 7,500, to represent those employers of cashiers who consider

11

having a stool for the cashier to sit on at the work station a work accommodation, and what's left are the other half who don't. So that takes care of the cashier." Tr. 64. She explained that, with respect to the merchandise marker, the hypothetical "would be a situation where the worker was working it out on their own and not involving the employer because if they involve the employer, then the hypothetical would have included a work accommodation." Tr. 64. Lastly, the VE stated that housekeeping cleaners "have an opportunity to sit if they choose to while they're dusting or doing something lower on the floor for a moment here or there, maybe not for any prolonged period of time, but there would be the opportunity to sit, and the worker would have to regulate that themselves." Tr. 64. She concluded, "That's how I envision my answer to those." Tr. 64. The following exchange then occurred:

> Wohleber's attorney: So how much of the time would a housekeeper be able to be in a seated position during the course of the work day? These would be people like that do housekeeping in a hotel, that kind of thing?
> VE: I can't answer that question.
> WA: I'm sorry? You can't answer that question?
> VE: No. There's no data for which I can depend on to answer that question.
> WA: Okay. So your testimony would be that the sitting down would be momentary kind of situations—
> VE: No. My—
> WA:—but it would be at their discretion—
> VE: It would be at—
> WA:—when they would choose to do it?
> VE: Yes. It would be at the discretion of the worker. And how long they would sit would be at the discretion of the worker and the employer.
> WA: I'm having a hard time envisioning someone in a cleaning position that could spend any significant time sitting—

Tr. 64-66. The VE stated that she has done a job analysis of the job and explained,

> A worker.... can sit while they're cleaning in the bathroom stall. They can sit while they're cleaning in an office. They can sit while they're cleaning in a hotel room. These are the kinds of cleaning jobs these housekeepers have. So there would be chairs.... There would be beds. There would be commodes. There would be tables. There would be countertops. There are all kinds of surfaces on which a worker can lean or sit when they need to.

Tr. 66.  Wohleber's attorney asked the VE how much time a person would be on their feet cleaning as opposed to sitting and the VE answered, "It depends."  Tr. 67.  She explained, "the DOT says two hours and six hours.  So we're going to work—we're going to just leave it at that. We won't depend on my job analysis.  We'll depend on the DOT."  Tr. 67.  Wohleber's attorney asked whether the job of housekeeping cleaner would be precluded if the person needed to be seated approximately for half a day, splitting their time between sitting and standing and the VE answered,

> It would.  And that would be a completely different hypothetical than the [ALJ's] No. 1. If the worker would have to split it half and half, that would be tantamount to sedentary work; wouldn't be able to use light jobs as examples.

Tr. 67.

Next, Wohleber's attorney asked the VE whether the person described in the ALJ's second hypothetical would be able to stand whenever they liked.  Tr. 67.  The VE stated that the ticket counter "would have trouble walking away from their work station but would be able to stand while counting as well as sit, as long as there was no loss of production or disruption in the work place, which was provided for in the hypothetical."  Tr. 68.  She further explained that the document preparer and food and beverage order clerk "routinely, as part of the day, will need to get up and move around to accomplish tasks.  So the worker would have to take responsibility for doing that when they needed to."  Tr. 68.  Wohleber's attorney asked whether a worker performing those jobs would have discretion of doing it when they chose to or whether they were dictated by the workflow.  Tr. 68.  The VE answered that it would be partially dictated by the workflow but that the worker would also have control over their workflow to some degree.  Tr. 68.  She explained, "they might not be able to get up and move around every moment they need

to, but they will be able to in a couple moments.  They might have to delay their need for a few minutes."  Tr. 68.

Lastly, Wohleber's attorney asked the VE whether the numbers that she provided for each job represented the number of jobs within the individual occupations identified by DOT codes or if it included other occupational titles also.  Tr. 68-69.  The VE stated that the numbers represent "occupational clusters because that is the only way the data is collected."  Tr. 69. Therefore, the 250,000 national jobs she identified for merchandise marker reflects the number of jobs within the occupational cluster and the specific job of marker "is a representative sample of a DOT code within that cluster."  Tr. 69.  Wohleber's attorney asked the VE whether it is possible that there are other occupational titles within the cluster that would not match the limitations described in the ALJ's hypothetical and the VE confirmed that it is possible.  Tr. 69. Wohleber's attorney asked whether the numbers the VE provided factored in the number of jobs that were eliminated because they did not meet the hypothetical requirements and the VE stated that they did not, explaining that there is no methodology for doing so.  Tr. 70.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

14

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also* Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

In his March 24, 2014, decision, the ALJ made the following findings:

1.  Michael T. Wohleber was insured for a period of disability and disability insurance benefits on the January 15, 2010 alleged onset date and he remains insured for these benefits through at least March 31, 2017.  Tr. 21.

2.  Mr. Wohleber has not engaged in disqualifying substantial gainful activity at any time since the January 15, 2010 alleged onset date.  Tr. 21.

3.  Mr. Wohleber's "severe" impairments are best described as follows: disorders of the back, obesity, obstructive sleep apnea, and an adjustment disorder with anxiety and a depressed mood.  Tr. 22.

4.  Since the January 15, 2010 alleged onset date, Mr. Wohleber has not had an impairment, or a combination of impairments, that has met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 24.

5.  Since the January 15, 2010 alleged onset date, and with the exception of possible briefer periods of less than 12 continuous months, Mr. Wohleber has retained the residual functional capacity to perform all the basic work activities described in 20 CFR 404.1521, 404.1545, 416.921 and 416.945 subject to the following limitations/restrictions: he can lift/carry up to 10 pounds frequently, and he cans stand or walk for  about two hours in an eight-hour period, and he can sit for about six hours in an eight-hour period, so long as he is afforded a "sit-stand" option without stopping work (that is he can sit down if he is standing up, and he can stand up if he is sitting down).  Mr. Wohleber can also stoop, crouch and climb ramps/stairs on an occasional basis.  However, Mr. Wohleber has not been able to kneel, crawl, or climb ladders, ropes or scaffolds.  Mr. Wohleber also has not been able to work in jobs where he would be exposed to high concentrations of extreme cold.  Mr. Wohleber also has not been able to work around hazards or at heights.  Mr. Wohleber can also constantly balance, and constantly reach, handle, finger and feel objects.  Mr. Wohleber can also constantly hear and speak.  Mr. Wohleber can also constantly engage in work tasks involving near acuity, or fair acuity, or depth perception, or accommodation, or color vision, or field of vision.  Mr. Wohleber can also perform some complex tasks, that is he is able to perform work where the specific vocational profile is 3 or 4 [According to the U.S. Department of Labor's *Dictionary of Occupational Titles* (hereinafter "*DOT*"), jobs with specific vocational profiles of 4 jobs are jobs that can be learned in three to six months.][1] However, Mr. Wohleber has not been able to perform "piece work" or work involving high productions quotas.  Tr. 25.

[FN1] Even though the claimant is capable of performing jobs with specific vocational profiles of 3 and 4, this case turns on his ability to perform a range of unskilled, sedentary work (see Finding 10 below).

6.  Mr. Wohleber has not been able to perform any of his past relevant work since the January 15, 2010 alleged onset date.  Tr. 30.

7.  Mr. Wohleber has been considered to be a younger individual in the "18 to 44" age group ever since the January 15, 2010 alleged onset date.  Tr. 30.

8.  Mr. Wohleber has a high school education by virtue of having earned a general equivalency diploma, and he is able to communicate in English. Tr. 30.

9.  Transferability of job skills is not material to the determination of disability as using the Medical-Vocational Rules as a framework supports a finding that Mr. Wohleber is "not disabled," whether or not he has transferable job skills.  Tr. 30.

10.  Considering his age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform.  Tr. 31.

11.  Mr. Wohleber has not been under a disability, as defined in the Social Security Act, at any time between the January 15, 2010 alleged onset date and the date of this decision.  Tr. 32.

## V. Parties' Arguments

Wohleber objects to the ALJ's decision on two grounds.  He argues that the ALJ erred because he did not follow the treating physician rule, or provide good reasons for the weight he gave, with respect to the opinion from his treating source, Dr. Berenger, and Nurse Gaddis.  Doc. 15, pp. 20-25.  He also asserts that the ALJ improperly relied on VE testimony regarding the number of jobs responsive to the ALJ's hypothetical.  Doc. 15, pp. 14-20.  In response, the Commissioner submits that the ALJ properly considered the opinion evidence and properly relied on the VE's testimony.  Doc. 18, pp. 6-14.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not adequately explain his treatment of Dr. Berenger's opinion

Wohleber argues that the ALJ improperly failed to apply the treating physician rule when he discussed the opinion signed by Dr. Berrenger and Nurse Gaddis. Doc. 15, pp. 20-25. Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544. In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the

18

supportability of the opinion; and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(a)-(d); *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

Regarding the opinions of Gaddis and Dr. Berrenger, the ALJ explained,

I have also considered the statement of a nurse practitioner on June 24, 2013 that Mr. Wohleber could not lift more than 25 pounds, and that he could not engage in repetitive lifting activities, and that Mr. Wohleber should avoid "overhead and lifting and bending activities for two months" [see Exhibit 12F:2]. I give little weight to this opinion as this source is not considered to be an acceptable medical source and as this source's opinion on June 24, 2013 is not consistent with her statement three weeks later on July 15, 2013 that the cla[i]mant was not able to lift or carry more than five pounds [see Exhibit 13F:2]. The fact that this source changed her answers to questions about Mr. Wohleber's lifting abilities without there being a reasonable explanation for why she changed her answers detracts from all of her opinions.  See *Hall v. Bowen*, 837 F2d 272, 276 (6th Cir. 1988) and *Villareal v. Sec. of HHS*, 818 F2d 461 (6th Cir. 1987) (absent evidence of a worsening in a claimant's condition, an administrative law judge is justified in rejecting the opinion of a treating source which is contrary to a previously expressed opinion by the same treating source. See also *Stanley v. Sec. of HHS*, 39 F3d 115, 118 (6th Cir. 1994) (an administrative law judge can reject a treating source's unexplained opinion that a claimant is disabled where the same treating source previously said Mr. Wohleber [sic] could perform sedentary work).

Notwithstanding the above, I have included in Mr. Wohleber's residual functional capacity the "sit-stand" accommodation that the above-mentioned nurse practitioner described in the report marked as exhibit 13F, a report that was also signed by a treating physician.  However, I do not accept as his own these source's opinions that Mr. Wohleber was not able to do lift/carry more than five pounds, and their opinions that he was not able to balance, and their opinions that Mr. Wohleber could only reach above his shoulders occasionally.  Besides being inapposite to the opinions of the above-mentioned State agency physicians who reviewed this record, I note that the aforementioned opinions are not supported by the record as a whole including the evidence cited in this decision including these source's own records.

Tr. 29.

Wohleber first argues that the ALJ "appears to assume that the opinion was that of CNP Gaddis" and "he does not mention Dr. Berenger by name."  Doc. 15, p. 20.  The Court disagrees. The ALJ accurately noted that the July 24, 2013, opinion was only signed by Gaddis and that the July 15, 2013, opinion was signed by both Gaddis and Dr. Berenger.  The ALJ's failure to refer to Dr. Berenger by name is not error.

However, Wohleber's next argument is more persuasive: that the ALJ did not follow the treating physician rule because he failed to address whether the opinion regarding Wohleber's lift/carry, reach and balance limitation was well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record, as he is required to do.  Doc. 15, p. 21; 19, p. 6.  *See Wilson*, 378 F.3d at 544; 20 C.F.R. § 404.1527(c)(2).  Having acknowledged that the second opinion was signed by Dr. Berenger and that Dr. Berenger was Wohleber's treating physician, the ALJ evidently considered the opinion to be that of Dr. Berenger and was required to give it controlling weight.[3]  *See id*. But in his explanation for why he did not credit the opinion, the ALJ only stated that the opinion was "inapposite" to the state-agency reviewers and "not supported by the record as a whole including the evidence cited in this decision including these source's own records."  Tr. 29.  The ALJ does not describe what evidence "cited in his decision" supported his conclusion and it is not clear to this reviewer.  For example, was the ALJ's discussion of Wohleber's cane use and/or medication side effects earlier in his decision relevant to his finding with respect to Wohleber's ability to balance?  Moreover, the ALJ did not discuss the clinical and laboratory diagnostic imaging results of Wohleber's spine, including two sets of x-rays and two MRIs, anywhere in his decision.  He vaguely refers to "these source's [sic] own records" without describing what, precisely, in the records was contrary to the opinion.  The ALJ explains that Gaddis' opinion limiting Wohleber to lifting/carrying five pounds was not supportable because it was inconsistent with Gaddis' prior opinion that Wohleber should lift no more than 25 pounds, but this does not

---

[3]  It is not clear what the ALJ meant when he stated, "However, I do not accept as his own these source's opinions that Mr. Wohleber was not able to do lift/carry more than five pounds, and their opinions that he was not able to balance, and their opinions that Mr. Wohleber could only reach above his shoulders occasionally."  If the ALJ meant that he did not consider these opinions to be Dr. Berenger's, then there is no treating source opinion entitled to controlling weight.  However, the ALJ thereafter refers to the "aforementioned *opinions*," "*their* opinions," and "*these* source's [sic] own records," indicating an opinion from multiple sources, i.e., Dr. Berenger and Nurse Gaddis.  On remand the ALJ will have an opportunity to clarify whether he considered Dr. Berenger an author of the July 15, 2013, opinion.

account for Dr. Berenger's opinion; Dr. Berenger did not sign off on the first opinion limiting Wohleber to 25 pounds.  Finally, the ALJ characterized the portion of the July 2013 opinion that he credited as requiring a "sit-stand" option for Wohleber when, in fact, the opinion includes a "sit-stand-walk" option.  Tr. 553.  In sum, the ALJ failed to adequately explain his decision regarding the weight he gave to the opinion of Dr. Berenger and the Court, therefore, is unable to conduct a meaningful review.  Accordingly, reversal is warranted.

### B.  On remand, the ALJ will have an opportunity to explain his finding with respect to the number of jobs available

Wohleber argues that the ALJ erred because he relied on VE testimony identifying the number of jobs a hypothetical individual like Wohleber could perform when the VE did not specify a number for the exact job titles identified.  Doc. 15, pp. 15-16.  The VE explained that the number of jobs she identified were for the "occupational clusters" of jobs rather than the specific occupational *titles* of the jobs.  Tr. 68-69.  She stated that it is possible there would be job titles within the occupational cluster that would not match the hypothetical but that it was not possible to proximate how many because the data is not collected that way and there is no standard methodology for doing so.  Tr. 69-70.  In other words, the numbers that the VE supplied included jobs that, possibly, the hypothetical individual identified by the ALJ could not perform, meaning that the actual number of jobs would be lower.  In his decision, the ALJ listed each occupational title identified by the VE and the number of jobs in the occupational cluster without acknowledging that there were, possibly, jobs included within the occupational cluster that Wohleber could not perform and without explaining why the numbers the VE supplied would

still amount to a significant number of jobs that Wohleber could perform.[4]  Tr. 31.  On remand,

the ALJ will have the opportunity to provide an explanation for this discrepancy.

## VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **REVERSED and**

**REMANED** for further proceedings consistent with this opinion.

Dated: July 8, 2016

Kathleen B. Burke
United States Magistrate Judge

---

[4]  In *Guiton v. Colvin*, 546 Fed. App'x 137, 142 (4th Cir. Nov. 7, 2013), the court observed,

As the ALJ explained, the DOT-specific job numbers Guiton would have the VE provide simply do not exist: "There apparently is no data, updated on a regular basis, available through either a public or private source[ ], that reports numbers of jobs by DOT code number." Tr. 34. Guiton does not dispute this observation. Thus, if we required a VE to produce job statistics specific to the DOT-coded occupations a claimant can perform, it is unlikely that the Commissioner would ever succeed in satisfying her burden. This cannot be the result the regulations intend. Indeed, that the data Guiton requests does not exist "is a sign that [Guiton] expects too much," and like the Seventh Circuit, we decline to "impose impossible burdens on the VE."